[No. 6083.]

# THE BOARD OF EDUCATION OF THE CITY AND COUNTY OF SAN FRANCISCO *v.* PATRICK DONAHUE ET AL.

EVIDENCE OF RESERVATION OF SCHOOL LOTS.— In 1856, Commissioners were appointed by the Common Council of San Francisco to select lots for school purposes.  The same year they submitted a report and accompanying map, designating twenty-eight lots as having been selected.  The map was certified by the Commissioners to be authentic and correct, and the lots selected were colored brown.  The report and map were approved by the Council : *held,* that the map with the accompanying certificate and report sufficiently identify the lots reserved for school purposes.

EJECTMENT FOR SCHOOL LOT IN SAN FRANCISCO.—The Board of Education of San Francisco may, under the statues defining its rights and powers, maintain ejectment for a school lot.

APPEAL from the District Court of the Nineteenth Judicial District, City and County of San Francisco.  The facts are stated in the opinion.

*John J. Williams* and *W. C. Burnett,* for Appellant, argued that the report of the Commissioners, with the certificate and map, were sufficient evidence of the reservation.

*Jarboe & Harrison,* for Respondent.

It was incumbent upon the plaintiff, therefore, to show, not only that the lands described in the complaint had been reserved, but also that such reservation was for *school purposes.* The evidence to that point consisted of the map, with the inscription thereon, the report of the Commissioners, and the testimony of the draughtsman of the map and of the Commissioners.

This testimony related exclusively to the fact and manner of making the map, and to informing the Court of what the Court itself could ascertain by an examination and inspection of the map, together with some historical facts concerning it which did not appear on its face.

The map itself, with the inscription thereon, does not contain any indication whatever of a reservation of the lot in question, and especially does it fail to contain any indication of its reservation for school purposes.

It is insisted by the plaintiff that the fact that certain spaces on the map are colored, warrants the conclusion that those spaces are lots reserved for public purposes; but unless it can be shown by some technological lexicon or by the *argot* of map-makers that a rectangular space colored *brown* has a significance which, without further explanation, is universally recognized among map-makers and those skilled in the art of "reservations" as equivalent to "school lot," the plaintiff will not be able to show that it has even *color of title* to the lot in question.

If it be also considered by the Court that such color has so utterly disappeared from the map in question that the very person who placed it there is unable, upon an inspection of the map, to say which lots were colored by him, how is the Court to be able to say that any lot was ever *colorably* "reserved"? Its injunction to the suitor who should rely solely upon this muniment of title for a recovery is likely to be *Ne crede colori!*

By the Court, Crockett, J.:

The action is ejectment for a lot in the Mission Addition of the City of San Francisco, and is included in the territory embraced by the Van Ness Ordinance, so called. The defendant was in possession at the commencement of the action, but at the trial showed no title or right to the possession, except such as is to be inferred from the fact of possession. Judgment was entered for the defendant, and the plaintiff moved for a new trial on the ground, amongst others, that the judgment and decision of the Court were not justified by the evidence. The motion was denied and the plaintiff appeals.

In deraigning its title the plaintiff relied upon Ordinance 822 of the Common Council of the City of San Francisco, (the Van Ness Ordinance); upon Ordinance 845 of said Council; upon the order of said Council appointing Commissioners to make a plan of that portion of the city, showing the streets and the lots reserved for public use, and to select lots as sites for school-houses, fire engine houses, public parks, etc.; also upon the report of said Commissioners; the map or plan reported by them; the ordinance or order of the Justices of the Peace exercising the powers of a Board of Supervisors, adopting, approving, and accepting the plan or map reported by the Commissioners; and upon the Act of the Legislature of March 11th, 1858, ratifying said ordinances. The Commissioners reported that they had selected twenty-eight lots as sites for school-houses, and that the lots so selected were one hundred and thirty-seven and one-half feet square, except those on the Potrero, which were one hundred feet by two hundred feet in size; and that as sites for engine-houses they had selected twenty-five lots, each thirty by one hundred and thirty-seven and one-half feet, except those on the Potrero, which were thirty by one hundred feet. The report also states that the Commissioners had adopted the plan or map which accompanied the report, "showing the streets so laid out, and the lots and squares selected for the above public purposes," and recommending its adoption as the official map of that portion of the city. The ordinance of the Justices of the Peace, acting as a Board of Supervisors, adopted the plan or map reported by the Commissioners, and declared it to be "the plan of the city in respect to the location and establishment of streets and avenues and the reservation of squares and lots for public purposes" in that portion of the city.

At the trial, the original plan or map was produced, and on inspection there did not appear on the face of it any explicit indication in terms of the lots reserved for school purposes or as sites for engine-houses. But there appeared certain spaces marked as public parks or squares, with the name of each written on the face of it; and another space with the words "Hospital Lot" written upon it. There also appeared a large

number of other spaces enclosed with rectangular lines between the streets, with the figures " 137–6 " so placed on the map as to indicate clearly that these figures were intended to apply to each side of these rectangular spaces. The lot in controversy appears on the map, inclosed in rectangular lines, with the figures " 137–6 " marked on the lines. That portion of the territory included in the map which the Commissioners in their report refer to as the " Potrero " is not designated on the face of the map as the " Potrero," but there appear on the face of it, south of Market Street, certain spaces inclosed in rectangular lines, with the figures " 100," " 200," marked on the lines respectively, and certain other spaces similarly inclosed, with the figures " 30," " 137½," or " 30," " 100 " also marked on their respective lines.

When the map was delivered by the Commissioners to the Common Council with the report, there was upon it a certificate or inscription, subscribed by the Commissioners, as follows: " City of San Francisco, for the location and dimensions of the streets to be laid out within the city limits west of Larkin and southwest of Johnson streets, with the lots or grounds selected and set apart for the several public uses as hereon designated, made, selected, and presented for the approval of the Common Council by the undersigned City-Surveyor and Commissioners, under and in pursuance of the provisions of an ordinance of the Common Council of the City of San Francisco, entitled ‹An Ordinance for the settlement and quieting of land titles in the City of San Francisco,' approved June 20th, 1855; and also an ordinance of the said Common Council, entitled ' An Ordinance providing for selecting and designating public squares and reservations for hospitals, fire engine and school-houses, and other public purposes, and for adopting the plan of the streets in the western and southwestern portions of the city, according to the provisions of Ordinance No. 822, and confirmatory of said Ordinance No. 822, approved September 27th, 1855.' "

At the trial, the draughtsman who made the map under the directions of the Commissioners was called as a witness, and testified that, by the direction of the Commissioners, he colored certain spaces inclosed in rectangular lines with brown,

and other smaller spaces similarly inclosed with red; that on those colored brown, some of them had the figures "100," "200," inscribed on the lines which inclosed them, while all the others had the figures "137–6," either inscribed on the lines, or the figures "137–6" were applicable to them, as appeared by the arrangement or plan of the map; that the lot in controversy is one of those colored brown, and on the lines inclosing it the figures "137–6" were inscribed, and now appear on the map; that the spaces marked as public parks or squares were colored buff, and a number of smaller spaces, inclosed in rectangular lines, were colored red; that the map was made on white paper, and was not colored in any part of it, except as above described. The witness pointed out on the map twenty-eight squares inclosed in rectangular lines, and with the figures applicable to or inscribed on the lines as above stated, which were colored brown; and he also pointed out twenty-five smaller squares, inclosed in rectangular lines, which he testified were colored red. There was no contradictory evidence. On the contrary, the testimony of this witness, in its material parts, was corroborated by that of one of the Commissioners. These being the facts, the question to be determined is, whether they established, *prima facie*, the identity of the lots reserved for school purposes.

It is clear beyond controversy that the Commissioners selected twenty-eight lots for school purposes, all of which were intended and were supposed to be one hundred and thirty-seven and one-half feet square, except those on the Potrero, which were intended and supposed to be one hundred by two hundred feet, and that they also selected twenty-five lots for the uses of the Fire Department, which were intended and supposed to be in size thirty by one hundred and thirty-seven and one-half feet, except those on the Potrero, which were intended and supposed to be thirty by one hundred feet in size. We are to read the map as though it was now in the same condition as when it was delivered to the Common Council, and the evidence shows that the paper on which the map was made was then perfectly white, with certain spaces inclosed in rectangular lines which were colored brown, and certain other smaller spaces similarly in-

closed which were colored red; that the spaces colored brown were twenty-eight in number, and the smaller spaces colored red were twenty-five in number; that all the spaces colored brown either had the figures "137-6" inscribed on the lines, or by the general plan and arrangement of the map these figures were applicable to the lines, except in respect to several spaces so colored which were situate south of Market Street, on which the figures "100," "200" were inscribed on the lines of each respectively. Of the smaller spaces colored red, situate north of Market Street, there are no figures on the map to indicate the size of them; but on the lines of those south of Market Street the figures "30," "137-6" are inscribed on the lines respectively, except that several of them have the figures "30," "100" inscribed on the lines. At the trial, evidence was offered by the plaintiff to show what the figures indicated; but it was excluded by the Court. But, considered in the light of the Commissioners' report, there is no difficulty in reaching the conclusion that the figures were intended to represent feet and inches. They report that the school lots were one hundred and thirty-seven and one-half feet square, except those on the Potrero, which were one hundred by two hundred feet; and when we find those figures inscribed on the lines of twenty-eight lots, or applicable to them by the general plan of the map, the presumption is that the figures were intended to designate the quantity by feet and inches. We leave out of view the notorious fact that the greater portion of the city was laid out into lots one hundred and thirty-seven and one-half feet square. We find, then, first, that the general color of the map was white; second, that the Commissioners reported that they had selected twenty-eight lots for school purposes, and their certificate on the map states that said lots are set apart for public use " as herein designated "; third, there were found on the map twenty-eight lots colored brown, with figures indicating the size, corresponding both in numbers and size with the lots stated in the report to have been selected for school purposes ; fourth, the coloring of the spaces on the map thus distinguishing them from the body of the map must have been done for some purpose, and when considered

in connection with the report, it becomes apparent that the purpose was to indicate that the lots so colored brown were reserved as school lots.

In reaching this conclusion, we impute no force to the oral testimony admitted at the trial, except in so far as it showed that when the map was delivered to the Common Council the map was on white paper, with twenty-eight spaces colored brown and twenty-five smaller spaces colored red; which spaces, as it now appears on the face of the map, were inclosed in rectangular lines, with figures indicating the sizes of the lots, as hereinbefore explained. Reading the map as it then was, and construing the map with the certificate thereon, in connection with the report, we are of opinion that the report and map of themselves sufficiently identify the lots reserved for school purposes.

Nor can it be seriously questioned, we think, that under the statutes defining the rights and powers of the Board of Education, it may maintain an action to recover the possession of a school lot.

Judgment and order reversed, and cause remanded for a new trial.

WALLACE, C. J., and McKINSTRY, J., concurring:

The oral testimony established the condition of the map when it was filed, and at the time when it became by law the official map. A reference to and inspection of the report and map—the colors on the latter being restored—sufficiently identify the lots selected by the Commissioners as school lots; and of these the lot sued for in this action is one.